1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11  COREY LOCKE, et al.,                          CASE No. 1:12-cv-01430-MJS

12                    Plaintiffs,                ORDER  GRANTING  DEFENDANT'S
                                                 MOTION  FOR  PARTIAL  SUMMARY
13         v.                                     JUDGMENT

14  AMERICAN BANKERS INSURANCE            (ECF No. 39)
    COMPANY OF FLORIDA,
15
                      Defendant.
16

17  **I.      INTRODUCTION AND PROCEDURAL HISTORY**

18
          Plaintiff Corey Locke initiated this action against Defendant Assurant, Inc., a
19
    Delaware Corporation on August 30, 2012.  (ECF No. 1.)  On October 10, 2012, Phillip
20
    C. Aschinger and Gregory A. Wright both consented to join the collective action against
21
    Defendant.  (ECF No. 6.)
22
          Defendant timely filed an answer to the Complaint on October 23, 2012.  (ECF
23
    No. 7.)   By stipulation of the parties and order of the Court, Assurant, Inc., was
24
    dismissed from the action and replaced by American Bankers Insurance Company of
25
    Florida,  hereinafter  "ABIC,"  or  "Defendant."  (ECF No. 26.) Plaintiffs filed the First
26
    Amended Complaint on January 29, 2013.  (ECF No. 28.)
27
          The First Amended Complaint is brought by Plaintiff in his individual capacity and
28

1

on behalf of other members of the public similarly situated and as aggrieved employees under the Private Attorneys General Act ("PAGA"). This action seeks to recover damages, penalties, injunctive relief, and attorneys' fees under six causes of action, alleging violations of: (1) The federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207; (2) California Labor Code §§ 510 and 1198; (3) California Labor Code §§ 1194, 1197, and 1197.1; (4) California Labor Code § 226(a); (5) California Labor Code § 2698, et seq.; and (6) California Business and Professions Code § 17200, et seq.  All causes of action derive from Defendant's allegedly improper classification of Plaintiffs as "exempt" employees not entitled to overtime pay and the resulting failure to pay Plaintiffs overtime wages. (ECF No. 28.)  ABIC filed its answer to the First Amended Complaint on February 15, 2013 generally denying the material allegations and asserting multiple affirmative defenses.  (ECF No. 31.)

The Court has jurisdiction over the matter pursuant to 29 U.S.C. § 216(b).  Venue is proper because Defendant transacts business within this judicial district.  The parties have consented to Magistrate Judge jurisdiction.  (ECF Nos. 10, 15.)

On August 30, 2013, Defendant ABIC filed a Motion for Partial Summary Judgment as to Plaintiff's first claim for FLSA violations.  (ECF No. 39.) Plaintiffs filed an opposition (ECF No. 52) and Defendant replied (ECF No. 58).[1] The matter is deemed submitted pursuant to Local Rule 230(g).

## II.   **LEGAL STANDARD**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  A fact is deemed "material" if proof of its existence or nonexistence would affect

---

[1]  In addition to the instant motion for partial summary judgment, two other motions are currently outstanding. On October 11, 2013, Defendant filed a motion to deny certification with regard to Plaintiffs' California state law claims due to lack of numerosity, and on October 21, 2013, Plaintiffs filed a motion to conditionally certify the FLSA claim as a collective action. (ECF Nos. 51 and 59.) The resolution of the other motions in light of the instant decision is discussed below.

1    the disposition of the case under the applicable law.  Anderson v. Liberty Lobby, Inc.,

2    477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered

3    is such that a reasonable jury might return a verdict for the nonmoving party.  Id.  In

4    determining whether a genuine issue has been raised, the court must construe all

5    inferences and ambiguities against the movant and in favor of the non-moving party.

6    United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

7         The party seeking summary judgment shoulders the initial burden of

8    demonstrating to the court that there is no genuine issue of material fact.  Celotex Corp.

9    v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold

10    demonstration, the non-moving party, to survive the motion for summary judgment, may

11    not rest on the allegations averred in his pleadings.  Rather, the non-moving party must

12    demonstrate that specific, material facts give rise to a genuine issue.  Id. at 324.  Under

13    this standard, the existence of a mere scintilla of evidence in support of the opposition's

14    position is insufficient to withstand the summary judgment motion.  Anderson, 477 U.S.

15    at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to

16    preclude the granting of the summary judgment motion.  Lujan v. National Wildlife Fed'n,

17    497 U.S. 871, 888 (1990).

18    **III.**    **THE SUBSTANTIVE ISSUE**

19         The ultimate issue to be resolved in this order, if it can be resolved at summary

20    judgment, is whether, under the facts and law discussed below, the primary duties of

21    Locke and the two consent plaintiffs require them to exercise discretion and independent

22    judgment on matters of significance such that they come within the administrative

23    exemption from entitlement to overtime pay.

24    **IV.**    **FACTS**

25         ABIC has proffered seventy-nine purported material facts which it characterizes

26    as undisputed.  (ECF No. 39-2.)  Plaintiffs dispute fifty-seven of them.  (ECF No. 52-1.)

27    However, the alleged disputes only rarely, truly, challenge the fact itself; instead, they

28    usually do little more than argue against the conclusion which Plaintiffs believe ABIC is

asking the Court to draw or infer from the fact stated.[2]  Plaintiffs then argue in support of the conclusion he thinks the Court should reach with regard to the fact. Most of the competing interpretations reflect, and require resolution of, the ultimate issue at hand – whether or not Plaintiffs' work and the manner in which they perform it renders them exempt from overtime laws applicable to hourly wage employees.

Plaintiffs submitted eighty-four facts which he claims are undisputed. (ECF No. 52-2.)  ABIC identifies only nine it concedes are unqualifiedly without dispute.  (ECF No. 58-1.)   As to the rest, it admits the facts stated, but, like Plaintiffs, cannot resist the temptation to tell the Court what it thinks the evidence says.  Defendant often responds that the facts, disputed or not, are immaterial, irrelevant, or both and then offers an explanation why.

The Court will not go through each of the proposed facts and discuss the evidence in support and opposition (as noted, usually it is the same evidence with competing interpretations offered) and rule on the various interpretations.  Instead, the Court will summarize the facts which it concludes are material and not genuinely in dispute; the Court will, however, note both sides of an argument on that rare occasion where a purported fact is indeed material and genuinely disputed.[3]

The following is the Court's summary of relevant facts:

**A.    ABIC's Business**

ABIC is a property insurance underwriting company.  It provides its services directly to property owners and to lending institutions who buy insurance for properties in which those lenders have a financial interest.  When a property suffers a loss, ABIC undertakes, in accordance with applicable state law, to have its adjusters determine if any part of that loss is covered by its insurance and if so, what ABIC should pay on that

---

[2]  Plaintiffs engage in the pervasive use of the phrase "Disputed to the extent that ABIC means to imply . . ." and the sentence: "The cited evidence does not support the proposition stated."
[3]  Similarly, while the Court has carefully reviewed and considered the parties' objections to evidence (ECF Nos. 52-17 and 58-10), it finds that most objections go to the weight of, and meaning to be attached to, the proffered evidence and overrules them on that ground.  In ruling on this motion, the Court considers only admissible, relevant evidence.

1  loss under the policy.  On any one loss, various ABIC representatives may be involved in
2  the process.  ABIC notes, however, that its primary business is underwriting and selling
3  insurance policies and its adjusters, not ABIC, adjust claims for ABIC's customers.

4    **B.    ABIC's Adjusters**

5  ABIC uses Inside Staff Adjusters ("ISAs") and Field Staff Adjusters ("FSAs"), both
6  groups ABIC employees, and also retains outside Independent Adjusters ("IAs") to
7  examine and process claims. Plaintiffs are FSAs. The duties of all three are quite similar.

8  Some claims are handled by both types of ABIC employee adjusters.  For
9  example, in "split assignment" cases, an FSA investigates the loss and then turns the file
10  over to an ISA who makes the ultimate coverage decision.  Such split assignment cases
11  account for 55 to 60 percent of Plaintiff Locke's work.  Conversely, on "desk file
12  assignments," a negligible portion of Locke's work, the IA conducts the field investigation
13  but the FSA completes the file.

14  Some claims assigned to FSAs involve large losses requiring manager review
15  and approval.  These account for 5 to 10 percent of Locke's assignments.

16  Some claims require special investigation (e.g., possible fraud) or subrogation
17  work; the FSA does not make the coverage decision on those cases or in cases
18  requiring re-inspection.  These total about 6 percent of Locke's assignments.

19  Finally, "full assignment" claims generally refer to claims where the adjuster
20  handles the full assignment but, if the size of the claim exceeds the FSA's authority,
21  manager review and approval are required.

22  Thus it appears Plaintiffs effectively have full authority to determine and close
23  roughly 24 and 34 percent of the claims assigned to them.  However, on virtually all
24  matters assigned, they investigate in the manner described below, even though the
25  ultimate coverage decision may be made by someone else after review.

26    **C.    Who Are the Plaintiffs?**

27  Locke, Aschinger, and Wright are Level III FSA adjuster employees of ABIC.
28  Only Level IV FSAs rank higher.  All three have college degrees and each had insurance

1   company adjusting experience before coming to ABIC.  Locke has worked as an adjuster

2   for twenty-five years, Aschinger for thirty years, and Wright for seventeen.  Each has

3   state licensure authorizing him to adjust claims.

4       Plaintiffs work out of their own homes using company cars.  Their manager, John

5   Hume, is based in Colorado. They are provided technical equipment and support.

6       **D.     How Plaintiffs Do Their Work**

7           **1.     According to ABIC**

8       ABIC describes Plaintiffs' duties as investigating, evaluating, and resolving claims

9   according to their own schedules.  This includes investigating generally and to identify

10  additional losses, evaluating coverage, estimating damages, negotiating settlements,

11  and managing and communicating as necessary to effect payment or denial of claims.

12  Such work may require Plaintiffs to identify and interview witnesses and assess their

13  credibility, analyze information on site and in records, prepare damage estimates,

14  negotiate settlements, assess and establish reserves, determine the need for, and work

15  with, third parties, evaluate for potential subrogation claims and possible fraud, and

16  negotiate with contractors regarding repairs.

17      ABIC essentially acknowledges it publishes and provides to the FSAs "best

18  practices" guides, instructions, etc., covering, it appears, most every aspect of the FSAs'

19  work (gathering facts, determining cause of loss and potential subrogation issues,

20  coverage, depreciation, communications with claimants, etc.). However, it maintains

21  these are just guidelines, information to help the FSAs do their job properly and in

22  accordance with ABIC policy.  Each FSA must nevertheless use individual discretion and

23  judgment in following and applying the guidelines in any given case.

24      Locke and Wright currently have $25,000 authority per claim and Aschinger has

25  $20,000.  On most full assignment claims within a Plaintiff's authority, he may resolve

26  claims without seeking manager approval.  On other types of claims the FSAs may

27  investigate and make recommendations, but the manager or ISA makes the final

28  payment decision.  It is ABIC's position that even in those cases where the FSA does not

1   make the final coverage decision himself, he makes recommendations to management
2   based on his independent investigation and judgment.

3        According to ABIC, FSAs' recommendations are generally followed.  Locke has
4   made recommendations on cases beyond his authority more than eighty times since
5   August 2009 and since January 1, 2010, 64 percent of those recommendations were
6   approved.  Similarly, since January 1, 2010, 71 percent of Wright's ninety-six claims
7   were approved and 76 percent of Aschinger's ninety-seven claims were approved.

8        ABIC also notes that since August 2009, ABIC has paid out $1.7 million (an
9   average of $7,800 per claim) on claims handled by Locke, $10 million ($5,400 per claim)
10  on Wright's cases and $11.8 million ($5,600 per claim) on Aschinger's cases.  Since late
11  2009, fifty of Locke's claims, forty of Wright's, and forty-nine of Aschinger's have been
12  closed without any payment being made to the insured based on the recommendation or
13  authority of the FSA.  ABIC does not state what percentage within each category was
14  handled exclusively by the FSA and what percentage required a final decision by
15  someone else.  ABIC adds that the FSAs also make recommendations about whether to
16  retain experts or third parties for assistance in connections with claims being adjusted.

17              **2.    According to Plaintiffs**

18       Although unstated, it appears that the Plaintiffs do not dispute the accuracy of the
19  hard facts asserted by ABIC; instead they object to the manner in which ABIC presented
20  the facts.  According to Plaintiffs, to the extent they perform as outlined above, they do
21  so in such a regimented, tightly controlled manner dictated by ABIC procedures and
22  software programs that they exercise little judgment and have virtually no discretion and,
23  indeed, are little more than "claims robots."  Plaintiffs argue that ABIC's training manuals,
24  Best Practices guides, workflow sheets, claims standards, estimating software, form
25  letters, guidelines, instructions, etc., so standardize FSAs' inspection, investigation, and
26  adjusting processes that the claims effectively resolve themselves.

27       Thus, while ABIC notes that Plaintiffs schedule their own work days, Plaintiffs
28  respond that that various ABIC written guidelines and policies reflect the expectation that

FSAs are on a rigid schedule not of their own making.  They are expected to contact the claimant within twenty four hours of a reported loss, to inspect the property within five business days, and to resolve the claim or issue a report on it within three business days thereafter.  They are expected to close eleven claims per week.  According to Plaintiffs, they regularly work more than fifty-five hours per week and even then do not meet those performance expectations.

The FSAs are given step-by-step directives or instructions[4] on: what photographs to take and in what order to take them, neighborhood canvasing, determining date of loss, when and how witness statements are to be taken, spotting signs of fraud, researching claims history, and investigating property damage.  They are given standards to be followed in communicating with claimants on opening, while investigating, and in resolving and closing claims.  Their request for claims payment checks are held for twenty-four hours to permit review and approval by others.

Plaintiffs attach great significance to the fact that ABIC mandates that  FSAs use the SIMSOL Estimating Program to determine how much to pay on claims.  According to Plaintiffs, all FSAs do is gather facts, verify local prices, and input them into SIMSOL, a system its promoter describes as "'a complete end-to-end solution for the electronic . . . estimating, claim documentation and data management for property claims.'"  (ECF No. 58-1 at 31.)  The FSAs input facts gathered and select items to be repaired or replaced and SIMSOL generates an estimate. FSAs have discretion to change an entry and pricing as necessary to ensure local variations are taken into account, but only rarely have to exercise that discretion.  SIMSOL itself audits its own estimates for consistency and conformity.  FSAs are to delay issuing explanations of benefits until SIMSOL has completed its audit.

Plaintiffs do not participate in litigation decisions or strategy.  FSAs do not truly set reserves.  ABIC sets reserves in all cases at $10,000 subject to mandatory increase by the adjuster if, and is such amount as, SIMSOL estimates.  Thus, Plaintiffs claim, they

---

[4] Commonly referred to by ABIC as "guidelines" or "how to" information.

1  are not permitted to make independent choices free from supervision because ABIC's

2  policies and particularly SIMSOL make those choices for them. Based on the above

3  Plaintiffs argue that their primary duties do not include the exercise of discretion and

4  independent judgment on significant matters and do not meet the qualifications of the

5  administrative exemption. See 29 C.F.R. § 541.200.

6  **V.      LAW AND ANALYSIS REGARDING EXEMPT STATUS**

7        **A.      The Regulations**

8        The FLSA obligates employers to pay employees at a rate of one and one half

9  times their normal pay rate for work over forty hours per week.  29 U.S.C. § 207(a)(1).

10  However, those employed in a bona fide administrative capacity may be exempted from

11  the overtime pay requirement.  29 U.S.C. § 213(a)(1).  The burden is on the employer

12  who claims an exemption to justify the exemption; it is to be narrowly construed against

13  the employer claiming it.  Solis v Washington, 656 F.3d 1079, 1083 (9th Cir. 2011).

14        United States Department of Labor regulations effective as of 2004 define an

15  exempt administrative employee as one who (1) is compensated at a rate of not less

16  than $455 per week, (2) "[w]hose primary duty is performing office or non-manual work

17  directly related to the management or general business of the employer or the

18  employer's customers; and (3) [w]hose primary duty includes the exercise of discretion

19  and independent judgment with respect to matters of significance."  29 C.F.R. §

20  541.200(a).

21        Only the third regulatory requirement is in dispute here; Plaintiffs concedes the

22  first two.  Thus, the issue is whether Plaintiff FSAs' primary duties include the exercise of

23  discretion and independent judgment with respect to matters of significance.

24        This is far from the first time the issue has been addressed with regard to

25  insurance adjusters.  Indeed, the 2004 regulations provide: "Insurance claims adjusters

26  generally meet the duties requirement for the administrative exemption . . . if their duties

27  include such activities as interviewing insureds, witnesses and physicians; inspecting

28  property damage; reviewing factual information to prepare damage estimates; evaluating

1   and making recommendations regarding coverage of claims; determining liability and

2   total value of a claim; negotiating settlements; and making recommendations regarding

3   litigation." 29 C.F.R. § 541.203(a).  The title given to the work is not determinative; the

4   applicability of the exemption turns on whether the duties of the employee fall within the

5   regulatory requirement. 29 C.F.R. § 541.2.   Not all claims adjusters qualify for the

6   exemption; the duties of each must be assessed on a case-by-case basis. (U.S.

7   Department of Labor Wage & Hour Div. Op. Ltr. (Aug. 26, 2005) (ECF No. 52-16, Ex. C)

8   and Fact Sheet # 17R (ECF No. 52-16, Ex. B), both judicially noticed at ECF No. 66.)

9          **B.     Relevant Caselaw**

10          The parties refer the Court to competing cases addressing this exemption

11   criterion with regard to arguably similarly situated semi-autonomous workers.

12          ABIC likens its FSAs to the adjusters in <u>In Re Farmers Ins. Exch.</u>, 481 F.3d 1119

13   (9th Cir. 2007).   There, as here, claims adjusters employed by Farmers sought a

14   determination that they were not subject to the administrative exemption and were thus

15   entitled to overtime pay.  The adjusters work circumstances were broadly similar to those

16   here.

17          Specifically, most of Farmers' adjusters worked out of their homes, were provided

18   company cars, phone lines, computer support, printers, and fax machines.  <u>Id.</u> at 1125.

19   Farmers provided written guidelines and training materials and identified procedures

20   which were mandatory and others that were recommendations.  Adjusters were audited

21   to ensure they followed the company's "best practices." They were expected to use a

22   computer software "price database" to help them estimate losses.  The average adjuster

23   paid approximately $1,000,000 in claims per year; claims ranged between $2,800 and

24   $8,000.  <u>Id.</u>  Their average salary was between $36,000 and $43,000 in the period 1998

25   to 2002.  They worked more than 40 hours per week but were not paid overtime.  <u>Id.</u> at

26   1126.

27          Farmers' adjusters made coverage determinations, recommended reserves,

28   interviewed the insured and others, and evaluated credibility.  They advised if fraud was

1   suspected. They negotiated settlements. If a claim exceeded the amounts they were

2   authorized to pay, they had to seek additional authority from others, but that authority

3   was given 75 to 100 percent of the time.  Id. at 1129.

4        The district court determined that those who paid in excess of $3,000 in claims

5   per month were exempt, but others were not. The Ninth Circuit reversed the lower

6   court's distinction based on value of claims paid and found that all of the adjusters were

7   exempt.  The appellate court noted that regardless of the type or size of claims handled,

8   the adjusters were "required to do virtually all of the very things that [29 C.F.R. §

9   541.203] contemplates" to include using discretion to determine whether the loss is

10  covered, recommending reserves, interviewing the insured and assessing credibility,

11  advising of suspected fraud and possible subrogation claims, determining blame for the

12  loss and negotiating with the insured or his lawyer.  Id. at 1124 and 1129.  "As far as we

13  are concerned, that says it all.  The district court's findings almost track word for word

14  the language in 541.203."  Id. at 1129.  Noting that only some of the adjusters made

15  recommendations regarding litigation, the court recited the regulation's reference to

16  "typical duties" and stated:  "[t]he regulation, however, does not require the adjuster to

17  perform each and every activity listed."  Id.  It found that the adjusters "use of computer

18  software to estimate claims did not eliminate the need for discretion and judgment any

19  more than does resort to other reference works or to the opinions of appraisers and

20  other experts."  Id. at 1130-31 (citing Cheatham vs. Allstate, 465 F. 3d 578, 585 (5th Cir.

21  2006)).

22       The court did note, however, that the Farmers' adjusters were distinguishable

23  from those who frequently had to seek approval before settling claims, had to get

24  supervisor authority before conducting additional investigation, and were so closely

25  supervised that they had no authority to make independent choices, characteristics

26  which, according to Dept. of Labor Wage & Hour Div. Op. Ltr., at 2, 6 (Aug. 26, 2005),

27  lent themselves to non-exempt status.  Id. at 1130.

28       The Farmers court found support in comparable facts and conclusions in the Fifth

11

1  Circuit's decision Cheatham vs. Allstate, 465 F. 3d 578 (5th Cir. 2006).  Cheatham

2  rejected Allstate adjusters' claims that they had been improperly classified as "exempt"

3  employees not entitled to overtime.  With regard to their duties and responsibilities, the

4  adjusters set reserves, planned and effectuated investigation, determined coverage,

5  investigated and determined liability in accordance with governing law, looked for

6  possible subrogation, identified underwriting risks and possible fraud, valued claims and

7  negotiated settlements.  Id. at 585, n.7 and 586.  They were required to document their

8  claims activities including communications with the insured, claimants and witnesses,

9  and their claims negotiation processes.

10  Moreover, in carrying out their responsibilities, they were required to follow

11  Allstate's formal practices and procedures including adhering to a liability matrix and

12  computer software which determined reserves, and they had to seek approval before

13  settling claims.  Id.  Based thereon, the adjusters argued that their obligation to follow

14  Allstate's practices and procedures and use the computer program had "relegated them

15  to nothing more than data input clerks" who no longer exercised independent judgment.

16  Id.  The Fifth Circuit was "unpersuaded" by the adjusters' arguments.  Id.  The court

17  noted that the regulation, 29 C.F.R. § 541.207(e)(1)[5], provides that using discretion and

18  judgment to make a recommendation, even though not authorized to take the action

19  recommended, is sufficient to meet the regulatory criteria.  The court concluded that the

20  adjusters were responsible for making recommendations and explaining the rationale for

21  those recommendations based on their experience and knowledge of the case.  The

22  Fifth Circuit concluded that the district court had correctly determined that the adjusters

23  exercised independent judgment, therefore qualified for the administrative exemption,

24  and, thus, were not entitled to overtime.  Id. at 586.

25  ABIC also notes, correctly, that other courts, both before and after the current

26  language of § 541.203 was adopted in 2004[6], have found insurance claims adjusters to

27

28
[5] The cited text is currently codified at 29 C.F.R. § 541.202(c).
[6] Without substantive difference from previous language.

be exempt.  See, e.g., Bucklin v. Am. Zurich Ins. Co., 2013 WL 3147019, (C.D. Cal. June 19, 2013) (applying California law, but relying heavily on § 541.203); Robinson-Smith v. Gov't Empls. Ins. Co., 590 F.3d 886, 896-97 (D.C. Cir. 2010); Jastremski v. Safeco Ins. Co., 243 F.Supp.2d 743, 745 (N.D. Ohio 2003); Palacio v. Progressive Ins. Co., 244 F.Supp.2d 1040, 1046 (C.D. Cal. 2002).

Plaintiffs acknowledge the above cases and their holdings.  However, they stress, appropriately, what the regulation, the cases, and common sense make clear: job title alone is not determinative; each case requires an analysis of its inherently unique facts and of the actual job duties required of the adjusters.

"'Discretion and independent judgment,' for the purposes of the administrative exemption, generally 'involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.'"  Calderon v GEICO General Ins. Co., 917 F.Supp.2d. 428, 441 (D. Md. 2012) (quoting 29 C.F.R. § 541.202(a). Section 541.202(c) adds that the exempt employee is one who "has authority to make an independent choice, free from immediate direction or supervision."  This then would exclude the employee who does nothing more than use skill "'in applying well-established techniques, procedures or specific standards described in manuals or other sources.'"  Calderon, 917 F.Supp.2d. at 441 (quoting § 541.202(e)).

Calderon dealt with GEICO security investigators who worked at the "lowest level" of GEICO's special investigative unit, part of its claims department. The security investigators reported to a supervisor who reported to a manager who reported to an assistant vice president of claims. Id. at 431.  Claims identified by computer software and an intake associate as bearing indicia of fraud were referred to investigators.  The investigators, who worked out of their own homes, were required to follow written investigative procedures to include receiving the assignment, creating a plan of action, gathering evidence, identifying and interviewing potential witnesses, conducting background and other investigations using industry-recognized databases and police

information, on occasion taking the claimant's statement under oath, preserving documents and other evidence, and writing a concise and complete summary of their findings and the bases for them.  Id. at 432-33.   Only about 20 percent of the 250 investigators had authority to settle.   Those that did not submitted their findings to an adjustor.   If the adjustor agreed, the investigator's final report was forwarded to a supervisor for action.  Investigators had authority to refer a claim to the National Insurance Crime Bureau or other state agencies if fraud was suspected.   Id. at 433-434.   GEICO reportedly maintained strict control and oversight over the investigators' reports which had to be written according to specific templates and which were carefully examined to ensure they complied with GEICO expectations both in form and substance.   Id. at 434.

The district court concluded, in effect, that GEICO's investigators were one step removed from exercising discretion and independent judgment as to matters of significance. "But an exercise of discretion that impacts or affects a matter of significance is not exercising discretion with respect to a matter of significance."   Id. at 442 (quoting Ahle v. Veracity Research Co., 738 F.Supp.2d 896, 908 (D. Minn. 2010)).   The Court determined that these investigators gathered facts to present to others for analysis.   Id. at 443.  It concluded they were not exempt employees and so were entitled to overtime pay.

Thus Plaintiffs would have this court conclude that the duties of ABIC's FSAs are much more akin to those of GEICO's Investigators than Farmers' and Allstate's adjustors or those described in § 541.202(a).  Plaintiffs proffer "five overarching reasons" for this conclusion: (1) the FSAs discretion and judgment is so strictly controlled and limited by ABIC's standardized claims, processing instructions, directives, guidelines, manuals, standards, review procedures, etc., that every step in investigating, inspecting, and adjusting is dictated and leads to the actual coverage decision on each claim; (2) FSAs must use ABIC's computer software on all claims, reducing FSAs to the role of fact finders who merely confirm that the software information is consistent with the claimed

1    damages and local prices; (3) FSAs use discretion and judgment only in organizing and

2    prioritizing their investigation, not matters of significance; (4) they lack authority to adjust,

3    settle and close claims on many assignments; and, (5) they do not negotiate

4    settlements, make litigation recommendations or communicate with counsel regarding

5    litigation.

6        **C.    Analysis**

7        The Court observes that the parties basically agree on what Plaintiffs do as FSAs

8    although they sharply disagree as to how much judgment and discretion is exercised in

9    carrying out their job responsibilities.  Both sides agree on what regulations control and

10   what they say and mean.  The parties have identified the major cases addressing this

11   issue with regard to other companies and employees.  All agree that each case must

12   turn on its own facts.  Thus, this court is left to decide where the facts in this case fit

13   along the "exercise of discretion and independent judgment" spectrum.

14       Some broad observations introduce the Court's analysis.  First, Plaintiff FSAs are

15   the eyes and ears of ABIC. When it comes to investigating and analyzing claims; the end

16   result of that investigative process necessarily is first filtered through the FSAs. Second,

17   ABIC appears to exercise tight control and goes to great lengths to ensure its FSAs

18   know what is expected of them when adjusting claims. Third, there is likely a point in any

19   business where such control becomes so extensive and detailed that it deprives the

20   employee of independent judgment and discretion. In such a situation, the employee

21   may do nothing more than record relevant and relay information to supervisors, or even

22   an automated computer program, that in turn analyzes the information to determine the

23   "correct" action or produce the "correct" result.

24       The Court finds the relationship between ABIC and its FSAs is not so

25   mechanized.  The FSAs exercise of independent judgment and discretion, albeit in

26   accordance with pervasive ABIC directives, plays a major role in resolution of claims

27   referred to them.

28       ABIC's claims service standards detail "required claim activities" including what to

tell the insured/claimant and how to communicate with him at various stages of the claim's process. (Pls.' Disp. Facts ("PDF") 39, ECF No. 52-2.)   ABIC provides "templates" for use in writing letters in various circumstances; Plaintiffs say there is one for every circumstance.  (PDF 13, 37.)  What ABIC calls "Excellent Customer Service" instruction is simply a customer service training document; "Business Etiquette" simply outlines non-claims handling policies; and statement guides provide a general overview or outline of questions that might be asked in in various circumstances. (PDF 40.) According to Plaintiffs all three of the preceding are "customer interactions techniques and scripts that must be followed".  (Id.)

ABIC has a work matrix setting forth timelines for processing claims.  ABIC calls it a guideline; Plaintiffs call it a requirement.   (PDF 20.)   ABIC outlines tasks to be completed in order during the adjusting process and dictates the types of information to be included in the claims file.    (PDF 32.)   A "Claims Investigation Techniques" PowerPoint presentation explains in detail the steps FSAs are to take in investigating claims.  (PDF 44.) A game, "Darts: Aim for Perfection" seems to do likewise.  (PDF 45.) ABIC's workflow sheet outlines the order in which property is to be inspected and photographed.     (PDF  47.)     ABIC  provides  "guidelines"  for  taking  appropriate photographs;  according  to  Plaintiffs  it  contains  step-by-step  instructions  of  what photographs to take and in what order they should be taken.  (PDF 21).   Similar "guidelines", or "step-by-step" instructions, as Plaintiffs characterizes them, exist for determining dates of loss and dates of discovery (PDF 23), identifying possible fraud (PDF 27), researching claims histories (PDF 28), inspecting damages (PDF 29), and considering possible subrogation (PDF 30).  ABIC either "issues a directive" or "provides information,"  depending  on  whether  you  ask  Plaintiffs  or  ABIC,  as  to  how  and  when witness statements should be taken.  (PDF 24 and 25).  ABIC has detailed depreciation guides it describes as tools to ensure consistency in estimates, leaving to FSAs to determine how much or what percentage of depreciation is to be applied to each item claimed. (PDF 34.)

1    Plaintiffs contend, in essence, that the foregoing directives and guidelines and the
2   requirement they use SIMSOL software in each case renders them little more than
3   automatons who move through rigidly scripted steps to gather information and then feed
4   it into SIMSOL which produces the desired result, that is, the value of the claim.  The
5   FSAs then follow regimented steps to pay and close the claim.  All they have to do is
6   "point and click" on SIMSOL to enter the gathered information and ensure the right items
7   for repair or replacement are selected. They may change a SIMSOL entry only as
8   necessary to ensure consistency with local pricing. Still, they acknowledge they are
9   ultimately responsible for what goes into SIMSOL and for adjusting the output if
10   necessary to ensure accuracy. (PDF 14, 15, 51, 52 & 53.)  SIMSOL itself advises that it
11   cannot be relied on blindly and may not apply at all in non-standard situations; it is
12   designed to give the claims adjuster "a solid reference to base his judgment on . . . ."
13   (ECF No. 58-9 at 4.)  But SIMSOL is programed to self-audit nightly. (PDF 60-62.)

14    ABIC has numerous "best practice" documents which it characterizes as rarely
15   reviewed guidelines.  (PDF 26.)  FSAs are to settle and pay different types of claims and
16   insureds according to ABIC instructions.  Indeed checks in payment of claims are "held"
17   for twenty four hours to ensure final review and approval of the FSAs' work.  (PDF 41 &
18   42.)  FSAs must follow ABIC instructions and procedures for requesting a payout on a
19   claim.  (PDF 17.)  FSAs undergo audits and reviews to ensure compliance with company
20   practices.  (PDF 18, 38.)

21    Regardless of the title, "guideline" or "requirement", attached, it is clear that ABIC
22   has published a wealth of material instructing its adjusters what to do and how to do it.
23   Indeed, it would be the rare company that did not, particularly in a field so highly
24   regulated as insurance, in which disregard of the regulations, rules, and appropriate
25   procedures could expose the company to significant liability.  Similarly, it would be the
26   rare employee who did not realize that to remain and succeed with such a company
27   required observance of the rules and procedures even if not absolutely mandatory and
28   rigidly enforced in every respect.  Such adherence to policy the company believes is

1    prudent cannot mean that no employee who follows the policy can be said to exercise

2    discretion and independent judgment on matters of significance.  No, the test is whether

3    they do in fact exercise such discretion and judgment regardless of how detailed and

4    regimented the path may be for getting to the point where they can and do exercise that

5    discretion and judgment. See Cheatham, 465 F.3d at 587 ("[T]he requirement that . . .

6    adjusters must consult with manuals or guidelines does not preclude their exercise of

7    discretion and independent judgment.").

8         Here, the Court agrees that the "guidelines" and "requirements" at issue provide

9    direction to a conclusion and require use of a software program to produce the final

10   number. However, these aids do not remove Plaintiffs' independent judgment in the

11   initial investigative stages.  Plaintiffs are called upon by ABIC to make decisions based

12   on experience and training. Rather than automate the process and rely solely on

13   SIMSOL algorithms, Defendant has elected to employ, pay and rely on Plaintiffs,

14   apparently based on their years of experience and judgment in resolving claims.

15        FSAs provide the answers to the key questions which must be asked along the

16   adjusting path.  The directives, as ABIC argues, tell FSAs what path to follow but not

17   precisely how to evaluate coverage and damage claims, negotiate settlements and

18   communicate with individual insureds in the states of mind and  circumstances unique to

19   each claim.   FSAs offer lists of things which should be covered and provide

20   considerations as to how to deal and communicate with different types of people in

21   different types of situations.   During their stage of the proceeding it is the FSA's

22   judgment, wisdom, and training that governs the response to a claimant and their claim

23   as well as how best to classify an article on SIMSOL and determine whether the

24   information reflected in the software actually matches the true facts.   Plaintiffs are

25   engaged in the exact kind of activities § 541.203(a) indicate are indicative of an adjuster

26   who qualifies for the administrative exemption.

27        The FSA has the ultimate responsibility to gather the facts and put them all

28   together and either determine or make a recommendation as to most every aspect of the

1    claims process.  The Court finds this to the defining characteristic that separates Plaintiff

2    FSAs from employees, such as the non-exempt investigators in Calderon, 917

3    F.Supp.2d. 428, who skillfully follow instruction but do not offer substantive analysis or

4    judgment.

5          What Plaintiffs have done as FSAs for ABIC over the years reflects the exercise

6    of judgment and discretion in matters of significance.  Each has authority to pay at least

7    $20,000 on his own determination. See Farmers, 481 F.3d 1129 (exempt adjusters had

8    the authority to negotiate final settlement); Cheatham, 465 F.3d at 586 (same). Granted

9    they do that in only about 25% of their cases, but they also make recommendations in

10   their other cases which are adopted at least two thirds of the time.  "The decisions made

11   as a result of the exercise of discretion and independent judgment may consist of

12   recommendations for action rather than the actual taking of action."  29 C.F.R. §

13   541.202(c). Here, the actions of Plaintiffs, even when making recommendations, are

14   found to constitute exercises of discretion with respect to matters of significance; they

15   have more than a mere indirect impact on a matter of significance as did the claim

16   investigators  in Calderon, 917 F.Supp.2d. at 442, and Ahle, 738 F.Supp.2d at 908.

17         As noted, ABIC has paid out at least several hundred thousand dollars each year

18   since 2009 on claims handled by each of the three Plaintiffs and closed out with no

19   payment tens of claims each year on the determination or recommendation of each of

20   them.  Whether these payment determinations were made exclusively by the Plaintiffs or

21   on their recommendation, they were the eyes, ears, and brains of ABIC whose judgment

22   as to how and why to process claims led to their being paid or rejected by ABIC.  See

23   Cheatham, 465 F.3d at 586 (Adjusters exercised independent judgment in preparing

24   recommendations and therefore qualified for the administrative exemption.).

25         In viewing all material facts in the light most favorable to Plaintiffs, the Court finds

26   that there is no genuine dispute that Plaintiffs' primary duty includes the exercise of

27   discretion and independent judgment with respect to matters of significance and

28   therefore are covered by the administrative exception to the FLSA. See 29 C.F.R. §

19

1  541.200(a); In Re Farmers Ins. Exch., 481 F.3d 1119 (9th Cir. 2007). Accordingly,

2  Defendant's Motion for Partial Summary Judgment as to Plaintiffs' first claim is granted.

3  **VI.    REMAINING STATE LAW CLAIMS AND OUTSTANDING MOTIONS**

4        In addition to Defendant's motion for partial summary judgment with respect to

5  Plaintiffs first claim for overtime wages under the FLSA, two other motions remain

6  outstanding. On October 21, 2013, Plaintiffs filed a motion to conditionally certify the

7  FLSA claim as a collective action. (ECF No. 59.) As Plaintiffs' FLSA claim has here been

8  adjudicated, and is no longer pending, the conditional certification motion is denied as

9  moot.

10       Further, on October 11, 2013, Defendant filed a motion to deny certification with

11  regard to Plaintiffs' California state law claims due to lack of numerosity. (ECF No. 51.)

12  Before addressing Defendant's motion, the Court notes that Plaintiffs, in their complaint,

13  allege only that jurisdiction is based on a federal question under 28 U.S.C. § 1331. (Am.

14  Compl. at ¶ 1.)

15       To the extent the Court has jurisdiction over the remaining state law claims, such

16  jurisdiction is supplemental in nature. See 28 U.S.C. § 1367(a). A district court may

17  decline to exercise supplemental jurisdiction where "the district court has dismissed all

18  claims over which it has original jurisdiction." See 28 U.S.C. § 1367(c)(3); see also Acri

19  v. Varian Assocs., Inc., 114 F.3d 999, 1000 (9th Cir. 1997) ("[A] federal district court with

20  power to hear state law claims has discretion to keep, or decline to keep, them under the

21  conditions set out in § 1367(c)."). Factors courts consider in deciding whether to dismiss

22  supplemental state claims include judicial economy, convenience, fairness, and comity.

23  Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1309 (9th Cir. 1992), abrogated by

24  Diaz v. Gates, 420 F.3d 897, 900 (9th Cir. 2005). "[I]n the usual case in which federal

25  law claims are eliminated before trial, the balance of factors . . . will point toward

26  declining to exercise jurisdiction over the remaining state law claims." Reynolds v.

27  County of San Diego, 84 F.3d 1162, 1171 (9th Cir. 1996), overruled on other grounds by

28  Acri, 114 F.3d at 1000.

1    Here, no unusual circumstances suggest that the Court should retain jurisdiction

2  over Plaintiffs' state law claims. While it appears that the parties are diverse, Plaintiffs

3  have not alleged a significant amount in controversy to establish diversity jurisdiction

4  under 28 U.S.C. § 1332(a) to allow Plaintiffs to proceed individually in federal court.

5  Plaintiffs only allege damages in excess of $25,000, well below the jurisdictional

6  minimum of $75,000. 28 U.S.C. § 1332(a); Rea v. Michaels Stores Inc., 742 F.3d 1234,

7  1237 (9th Cir. 2014) ([T]he general rule is that "the amount in controversy is determined

8  from the pleadings as they exist at the time a petition for removal is filed."). As the

9  amount in controversy is not met, diversity jurisdiction does not exist for Plaintiffs to

10  maintain an individual action in federal court.

11    Likewise, Plaintiffs do not meet the minimum requirements to maintain federal

12  jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)

13  ("CAFA"). "CAFA provides federal jurisdiction to class action where, 'the number of

14  members of all proposed plaintiff classes' must be 100 or greater, § 1332(d)(5)(B), and it

15  defines 'class members' to mean 'the persons (named or unnamed) who fall within the

16  definition of the proposed or certified class,' § 1332(d)(1)(D)." Miss. ex rel. Hood v. AU

17  Optronics Corp., 134 S. Ct. 736, 742, 187 L. Ed. 2d 654 (2014). District courts have

18  applied the preponderance of the evidence standard to CAFA's 100-person numerosity

19  requirement. See, e.g., Fergerstrom v. PNC Bank, N.A., 2014 U.S. Dist. LEXIS 58676

20  (D. Haw. Feb. 27, 2014). Defendant moved to deny certification of class action based on

21  California state claims asserting that there were only seventeen potential class members

22  in the state of California. (See ECF No. 51.) In opposition, Plaintiffs contend that

23  Defendant understated the number of class members in California and that there are at

24  least twenty-one class members. (ECF No. 97 at 3-4.) Regardless, either estimate of the

25  number of class members falls well short of the 100 member minimum under §

26  1332(d)(5)(B), and it is not possible for Plaintiffs to establish a basis for jurisdiction under

27  CAFA.

28    Having considered the matter, and in light of the resolution of the federal claim,

and finding no alternative basis for jurisdiction, the Court declines to exercise jurisdiction over Plaintiffs' state law claims, pursuant to Section 1367(c)(3), and dismisses them without prejudice. Plaintiffs may pursue their state law claims in state court. See Reynolds v. County of San Diego, 84 F.3d 1162, 1171 (9th Cir. 1996) (dismissal of pendent state claims following dismissal of federal claims must be without prejudice), rev'd on other grounds by Acri v. Varian Assocs., 114 F.3d 999 (9th Cir. 1997). Accordingly, Defendant's motion to deny certification to the state law claims is denied as moot.

VII.   **ORDER**

For the reasons discussed above, IT IS HEREBY ORDERED that

1. Defendant's Motion for Partial Summary Judgment as to Plaintiffs' first claim (ECF No. 39) is GRANTED;

2. Plaintiffs' remaining state law claims are DISMISSED without prejudice;

3. All pending motions are DENIED as MOOT (ECF Nos. 51, 59.); and

4. The Clerk of the Court is directed to enter a judgment of dismissal in accordance with this Order and close the file.

IT IS SO ORDERED.

Dated:   May 19, 2014                    /s/ _Michael J. Seng_

UNITED STATES MAGISTRATE JUDGE